**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 11 CR 502-1 |
| | ) | Hon. Charles R. Norgle |
| AVALON BETTS-GASTON, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

In 2011, Defendant Avalon Betts-Gaston ("Betts-Gaston") and her codefendant, Dimona

Ross ("Ross"), were indicted for two counts of wire fraud, arising out of a foreclosure relief

scheme that began around March 2006 and continued until about October 2007. During the time

of the scheme, Betts-Gaston was a self-employed licensed attorney and Ross was a licensed real

estate loan officer working at First Choice Funding. In addition to their licensed professions, the

two women founded IJCN Investments, LLC ("IJCN"). Betts-Gaston was a managing member

and the registered agent for IJCN, which functioned as the major vehicle for their fraud.

Ross ultimately pled guilty to one count of wire fraud. On the other hand, Betts-Gaston

went to trial on the charges. After a six-day trial, the jury found Betts-Gaston guilty beyond a

reasonable doubt on all charges. Before the Court is Betts-Gaston's post-trial motion arguing that

Federal Rule of Criminal Procedure 29 warrants a judgment of acquittal to be entered; or in the

alterative, Betts-Gaston requests a new trial pursuant to Federal Rule of Criminal Procedure 33.

For the following reasons, the motion is denied.

## I. BACKGROUND

After graduating from law school in 2000, Avalon Betts-Gaston worked for a medium-

sized law firm specializing in employment insurance litigation. But in the early 2000s, Betts-

Gaston saw opportunity in the burgeoning real estate market. After two years with the medium-sized firm, she opened her own law firm and started doing real estate transactions. For several years she performed the role of the attorney at real estate closings. She became acquainted with Ross during the course of those real estate transactions and the two chose to become business partners, founding IJCN in 2006. What might have started as a well-intentioned business plan to help people struggling to meet the mortgage payment obligations on their homes became a criminal enterprise in which Betts-Gaston and Ross contrived fraudulent real estate transactions to defraud the homeowners selling their homes and the financial institutions funding the loans.

In July of 2011, Betts-Gaston and Ross were indicted for wire fraud in violation of 18 U.S.C. § 1343. The government alleged that Betts-Gaston and Ross submitted materially false information on mortgage loan documents in three real estate transactions totaling approximately $850,000. However, the government only charged the defendants with two counts: one associated with the sale of a house at 7759 S. Trumbull in Chicago, Illinois (the "Trumbull Property"), and a second associated with the sale of a house at 5140 W. Howard in Skokie, Illinois ("the Howard Property"). The Trumbull Property involved a $180,614.05 wire transfer on July 28, 2006, from the Bank of New York City in New York to Founders Bank in Illinois. The Howard Property involved a $252,163.39 wire transfer on September 1, 2006, from JP Morgan Chase Bank in New York to Founders Bank in Illinois.

Ross reached a plea agreement with the government in which she accepted responsibility and pled guilty to one count of wire fraud; Betts-Gaston, however, maintained her not guilty plea and chose to defend the charges at trial. Before trial, the Court entered several evidentiary rulings. One of which was the March 12, 2015 Order granting the government's <u>Santiago</u> Proffer pursuant to Federal Rule of Evidence 801(d)(2)(E). The Order allowed the government to admit:

(1) statements made by an employee of IJCN, and (2) statements made by the straw buyers used in the mortgage fraud scheme. In a written order on April 27, 2015, the Court found that the proposed testimony from Betts-Gaston's putative expert was irrelevant to the elements of wire fraud and had little probative value; thus the Court barred the expert from testifying under Federal Rules of Evidence 401 and 403, respectively. Betts-Gaston filed a motion asking the Court to reconsider its April 27th Order and the Court heard oral arguments on the day of trial, June 23rd, before jury selection. The Court denied the motion because the written summary of the expert's proposed testimony did not comply with Rule 16 of the Federal Rules of Criminal Procedure and Betts-Gaston's renewed arguments were unpersuasive. The Court then ruled on the outstanding motions *in limine* before a jury venire was selected.

A fourteen person jury was then selected, twelve members with two alternates, and the trial began. Over the course of the trial, the government presented testimony from: 1) Ross, the codefendant; 2) Sandra Spikes-Davis ("Spikes-Davis"), the former homeowner of the Trumbull property; 3) Mitchelle Kmiec ("Ms. Kmiec"), the sister of the former homeowner of the Howard Property, Charles Kmiec ("Mr. Kmiec"), because Mr. Kmiec died after participating in Betts-Gaston's foreclosure relief scheme; 4) Tracy Lee Kepler ("Kepler"), the investigator from the Illinois Attorney Registration and Disciplinary Commission ("ARDC") who investigated Betts-Gaston's disciplinary case; 5) Robert Brennan ("Brennan"), the former homeowner of the third property referenced, but not expressly named, in the indictment; 6) Surrina Hamb ("Hamb") and Tanisha Blanchard, two former employees of IJCN; 7) Armando Arevalo ("Arevalo") and Norman Ikonen ("Ikonen"), two representatives from the mortgage lending institutions that provided the loans on the Trumbull and Howard properties; 9) Mark Gold ("Gold"), an investigator for the Federal Reserve Bank of New York; 10) one of the Federal Bureau of

Investigation ("FBI") agents who investigated Betts-Gaston's criminal case; and 11) multiple records custodians. In conjunction with the testimony, the government presented documentary evidence of the real estate transactions in which Betts-Gaston participated. In her defense, Betts-Gaston called to the stand a FBI agent that investigated her criminal case and she testified herself.

The government produced evidence showing that IJCN advertised a program to help homeowners who were at risk of losing their homes to foreclosure. The evidence showed that after forming IJCN, Betts-Gaston and Ross facilitated four real estate transactions through the use of their company. Ross handled obtaining the mortgages on the transactions, Betts-Gaston managed the legal aspects of the transactions, and they both interacted with the victim-homeowners and the IJCN business bank account. Betts-Gaston was at the center of each of these transactions: she was the attorney representing the homeowners selling their homes; she was the attorney acting on behalf of the title insurance company; she was the owner of IJCN, which ultimately obtained control of the homes; and in the Trumball Property transaction, she was the daughter of the buyer.

The evidence showed that Sandra Spikes-Davis purchased the Trumbull Property as her personal residence in 1994. As of 2006, she owed about $168,000 on the mortgage and made monthly payments of $921. But after losing her job at the Chicago Tribune, she began to fall behind on the mortgage payments. Spikes-Davis spoke with her friend Sylvia Hamb, who told her to contact her niece Surrina Hamb, who worked for a real estate company—IJCN—that helped distressed homeowners refinance their homes instead of face foreclosure. Spikes-Davis contacted Hamb, was told that she could delay her mortgage payments for six to eighteen

months, and began to work with Hamb, Ross, and Betts-Gaston at IJCN. She was never under the impression that she was selling her home.

Spikes-Davis met in person with Betts-Gaston one time in June of 2006 for about an hour. Betts-Gaston had her sign documents, but never explained anything about the IJCN program. Betts-Gaston collected Spikes-Davis's signature on the documents, however, much of the other information on the documents was left blank. Spikes Davis was told that the blanks would be filled out at closing. Spikes-Davis signed an attorney representation document stating that Betts-Gaston would be her attorney and left the meeting with the understanding that Betts-Gaston would represent her on some sort of home refinance transaction. Spikes-Davis was told that her house would be going into a trust, but that the trust would be in her name. She was not told that she was giving up any interest or ownership in her home. Then, Spikes-Davis was not contacted by Ross, Betts-Gaston, or any other IJCN employee until after the closing on the Trumbull Property occurred.

What actually occurred at the formal closing on July 28, 2006, was much different than what Spikes-Davis was told and expected. Using the documents Spikes-Davis signed earlier but did not complete, all of Spikes-Davis's interests in the Trumbull Property were quitclaimed to a trust at Chicago Title Land Trust (the "IJCN trust") in June of 2006 for ten dollars. Also prior to the closing, Betts-Gaston recruited her father, James Betts ("Betts"), to serve as the straw buyer on the transaction. Ross and Betts-Gaston then worked together to submit a loan application, with Betts named as the debtor, to Fremont Investment and Loan. Betts's income amount stated on the loan application and his purpose for buying the Trumbull Property as a second home were false. On July 28, 2006, the IJCN trust sold the Trumbull Property to Betts. Spikes-Davis was not notified, and thus, was not present at the closing. From closing the transaction, a check for

$31,553.48, essentially the equity from Spikes-Davis's home, was issued to IJCN. That equity was commingled with IJCN's business account. There was no escrow account. No money was set aside in a separate account for Spikes-Davis's benefit. Betts was paid $5,000 for serving as the straw buyer and Hamb was paid an amount between $1,000 and $1,500 for the referral. Nothing about IJCN's involvement was represented on the HUD-1 settlement statement.

Shortly after the closing, Hamb visited Spikes-Davis's house and had her sign a rental agreement to remain in her own home. Spikes-Davis signed it, and began making payments in September of 2006 to IJCN in the amount of $1042 per month, as the agreement provided. Betts never moved into the Trumbull Property or used it as a second home.

There was less background presented about the Howard Property at trial, in large part due to the fact that Mr. Kmiec died on August 31, 2006, the day before the closing. What was presented at trial was that Mr. Kmiec owned the Howard Property and when he found himself in financial trouble he reached out to IJCN. Mr. Kmiec sold his house to Bobbie Ross, codefendant Ross's mother, on September 1, 2006. Bobbie Ross in turn deeded the Howard Property to the IJCN trust. The HUD-1 settlement statement indicated that Mr. Kmiec was due $82,766.29 from the sale of his house; that money, however, went to IJCN. No separate escrow account was established for Mr. Kmiec's funds. Ross testified at trial that her mother's stated income on the loan application, among other things, was false. Ross also testified that IJCN provided the down payment to her mother and IJCN paid her mother a fee for acting as the straw buyer, but none of that information was disclosed on the settlement statement. When Mr. Kmiec's sister learned about the transaction, she tried to collect the equity proceeds on the Howard Property from Betts-Gaston, but Betts-Gaston never remitted the equity payment.

6

Overall, the evidence showed that after Betts-Gaston and Ross solicited these distressed homeowners, they used IJCN to siphon one hundred percent of the equity out of the sellers' homes and left them with no legal rights or benefits of homeownership. At the end of the transactions, the victim-homeowners were without control of the equity or a legal right to possess their homes. The lenders were left without payment on the mortgage and their recourse to foreclose on the collateral was inhibited. IJCN, on the other hand, collected generous fees and the straw buyers were paid thousands of dollars, essentially for the use of their names, to facilitate the receipt of fraudulent home loans.

At the conclusion of trial, the twelve-person jury unanimously found Betts-Gaston guilty on both counts of wire fraud. This post-trial motion followed, the government responded, and Betts-Gaston chose not to reply. The motion is briefed and before the Court.

## II. DISCUSSION

First, Betts-Gaston challenges the sufficiency of the evidence that was introduced to support her two-count conviction of wire fraud. She argues that the government did not prove its case and a judgment of acquittal should be entered pursuant to Rule 29. Alternatively, Betts-Gaston moves for a new trial pursuant to Rule 33. She lists ten separate arguments regarding how she was deprived of a fair trial and needs another adjudication of her conviction.

### A. Betts-Gaston's Motion Under Rule 29

#### 1. Standard of Decision for a Rule 29 Motion

When reviewing a defendant's claim that there was not enough evidence to support his or her conviction, the Court "view[s] the evidence in the light most favorable to the prosecution," meaning that all reasonable inferences are construed in the prosecution's favor. Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also United States v. Pust, Case No. 13-3747, 2015 WL

4898976 at *2 (7th Cir. August 18, 2015). The Court will not overturn the conviction if it finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id.

### 2. There was Sufficient Evidence to Support Betts-Gaston's Conviction

Betts-Gaston takes a shotgun-blast approach, arguing that the evidence presented at trial was insufficient to show that: 1) she "knowingly caused a wire communication for the purpose of executing a scheme"; 2) she "devised and participated in a scheme to defraud either the homeowners or the lending institutions"; 3) she "intended to defraud either the homeowners or the lending institutions"; 4) she made "materially false representations [] to the lenders or homeowners"; 5) she knew the nature and falsity of the statements in the loan applications; 6) her "materially false statements made in the loan applications caused the wire communication or furthered the alleged scheme"; and 7) "the wires had traveled through interstate commerce." Def.'s Mot. for J. of Acquittal Pursuant to Fed. Crim. P. 29 and Mot. for a New Trial Purusant [sic] to Fed. R. Crim P. 33 at 2 [hereinafter "Def.'s Post-Trial Mot."]. However, Betts-Gaston's argument misses its mark. Her seven assertions lack any citation to the trial record or citation to legal authority. The Court will not develop Betts-Gaston's argument any further than necessary to ensure that the government proved the required elements of wire fraud at trial. See United States v. Alden, 527 F.3d 653, 664 (7th Cir. 2008) ("Because it is not the obligation of this Court to research and construct the legal arguments available to parties, … these arguments are waived and warrant no discussion."); United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We have repeatedly made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority are waived….").

The elements required to convict someone for wire fraud are minimal. There are not seven elements as Betts-Gaston's argument purports. "'To convict a defendant of wire fraud, the government must prove three elements: (1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) a use of an interstate wire in furtherance of the fraudulent scheme.'" United States v. Marr, 760 F.3d 733, 734 (7th Cir. 2014) (quoting United States v. Turner, 551 F.3d 657, 664 (7th Cir. 2008)); see 18 U.S.C. § 1343; see also Pust, 2015 WL 4898976 at *2.

### a. Evidence that Betts-Gaston Participated in a Scheme to Defraud—the IJCN Foreclosure Relief Program

Turning to the first element of wire fraud, there is no doubt that Betts-Gaston participated in a scheme to defraud. "A scheme to defraud requires 'the making of a false statement or material misrepresentation, or the concealments of a material fact.'" United States v. Sloan, 492 F.3d 884, 890 (7th Cir. 2007). The evidence showed that the transactions on both the Trumbull and Howard Properties included the following misrepresentations: (1) the source of the straw buyers' down payments; (2) the straw buyers' incomes; (3) the fact that IJCN, not the straw buyers, would make the mortgage payments; (4) the fact that IJCN received lump sums from the victim-homeowners' sales proceeds; (5) the statements to the victim-homeowners that the equity from their homes was being held in an escrow account; and (6) the disclosures to the victim-homeowners about the terms of the IJCN foreclosure relief program. After the sales transactions, Ross and Betts-Gaston also concealed their comingling and personal use of IJCN funds. Specific to Betts-Gaston, she concealed her inherent conflicts of interest from the homeowners she purported to represent. In consideration of all of these material misrepresentations, there was overwhelming evidence that the IJCN program was a scheme to defraud.

Betts-Gaston also readily admitted that she participated in the scheme on several accounts. First, in a letter she sent to the ARDC, she wrote, "I was legal counsel on a sales transaction involving the property located at 7759 South Trumbull, Chicago Illinois. I am also a principal in the company which assisted Ms. Spikes-Davis in her situation...I am a principal in IJC[N] Investments, LLC 1[sic]. Here is some additional information regarding IJCN Investments and Ms. Spikes-Davis's transaction." Tr. at 296. Betts-Gaston goes on in the letter to describe her detailed involvement in the Trumbull Property transaction. Secondly, Betts-Gaston admitted her participation during a sworn statement to the ARDC, Betts-Gaston talked about how she formed IJCN with her codefendant Ross: "I just told her what my idea was as far as how IJCN can be formed and what IJCN would do and how we would do it differently from all the other companies." Id. at 310. Betts-Gaston's statements to the ARDC about her participation in IJCN were consistent with her testimony at trial.

At trial, Betts-Gaston again testified about her participation in the IJCN fraud scheme. She said that her "role was focused more on the legal aspect, in making sure that the -- explaining things to the homeowners initially, so that they could – you know, knew what they were getting into, legal documents they were signing, and like that." Id. at 812. Betts-Gaston testified about her intimate involvement in the management, decision-making, and finances of the IJCN operations. When asked whether she was a signatory on the IJCN bank account at LaSalle Bank, Betts-Gaston responded, "Yes, I was." Id. at 813. Although she claimed that she did not pay herself a salary from the IJCN bank account, she nonchalantly answered that she "took some return of capital, because I put too much more in than I had originally agreed to, and I also had some loans." Id. at 896. The evidence showed that Betts-Gaston was extensively involved with IJCN from the time it was formed in March of 2006 until its defunction in August

of 2007. Betts-Gaston's company, IJCN, was the primary entity used to carry out the scheme to defraud. The Court finds that a rational trier of fact could find the first essential element of wire fraud for both the Trumbull and Howard Properties.

### b. Evidence that Betts-Gaston Intended to Defraud

Next, the Court turns to the second element of wire fraud: Betts-Gaston's intent to defraud. "'An 'intent to defraud' means that the defendant acted willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for himself or causing financial loss to another.'" Pust, 2015WL4898976 at *2 (quoting United States v. Paneras, 222 F.3d 406, 410 (7th Cir. 2000)). "'However, because direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." Id. Here, the evidence showed that Betts-Gaston intended to defraud both the lenders and the homeowners involved in the Trumbull and Howard transactions.

### i. Betts-Gaston Intended to Defraud the Lenders

The record is replete with both circumstantial and direct evidence that Betts-Gaston intended to defraud the financial institutions, the primary victims of her scheme. Betts-Gaston structured the real estate transactions and created the IJCN trust to deceive the mortgage lenders. She used straw buyers (her father and Ross's mother) to gain control of the properties and then transferred the deeds on the properties to the IJCN trust without notice to the mortgage lenders. She did this to hinder the lenders' ability to foreclose on the property in the event that IJCN stopped making the monthly mortgage payments. She readily admitted this intent behind her scheme initially to the ARDC and again at trial.

Under oath, in her conversation with ARDC Investigator Kepler, Betts-Gaston spoke about the general operations of the IJCN scheme. Kepler asked Betts-Gaston, "Who makes the payments to the mortgage company?" Id. at 324. In a circuitous answer, she eventually said that the payments came from IJCN's account. To follow up, Kepler asked, "[s]o the purchaser, the one who actually takes out the mortgage … doesn't make the mortgage payments?" Betts-Gaston answered "No." Id. In the same conversation, Betts-Gaston further elaborated on the purpose of the IJCN trust, she said, "honestly, it gives us, if in the event we get to the door with regards to a judicial sale because the trust is not party to the transaction, the foreclosure transaction, we can come in and kind of get more time to stave off the sale if we had to. So it's kind of like as a safety mechanism to help the homeowner in the event we need to kind of go into court and get some more time because the judge will say, oh okay, this party was never brought into the case, and we can give them more time." Id. at 327. This is direct evidence that Betts-Gaston intended to deceive the lenders by misrepresenting who owned and controlled the Trumbull and Howard Properties, delaying the lenders' ability to foreclose on the hones, and ultimately causing them financial loss.

Likewise, when asked on direct examination at trial about the quitclaim deed that was used to transfer the Trumbull Property to the IJCN trust, Betts-Gaston stated: "The purpose of this document was to afford the homeowner time. So, for example, because they were up -- coming up on a judicial sale, which would mean they would lose the house entirely at that point, but having it in the trust would allow us to go into court and to stop the sale." Id. at 845. On cross-examination, Betts-Gaston admitted that "[she] knew that payments we – that IJCN was going to make payments on [Betts's] behalf, yes." Id. at 978. However, she never disclosed that financial arrangement with the lender on the Trumbull Property transaction. Furthermore, she

12

admitted "Yes" that "she wanted to be able to delay a judicial sale of the home if that were to come about." Id. at 984. Once again, this is direct evidence that Betts-Gaston intended to cheat lenders by delaying their ability to collect mortgage payments or foreclose on the collateral they are due, causing them financial loss.

There is also evidence that Betts-Gaston intended to defraud the lender in the Trumbull Property transaction by falsifying her dad's income amount on the loan application. The government's questions to Ross provided the following colloquy:

> MR. STORINO: Now, what did Mr. Betts tell you regarding his monthly income when you talked to him?
> THE WITNESS: He told me he made – it was somewhere around 4000 a month or something like that.
> …
> MR. STORINO: Did he tell you that he made $15,000 a month in this conversation?
> THE WITNESS: No.
> …
> MR. STORINO: Did you subsequently have a conversation with the defendant after you spoke with her father?
> THE WITNESS: Yes.
> …
> MR. STORINO: What did you tell the defendant regarding whether her father qualified as a buyer?
> …
> THE WITNESS: I told her that her father did not qualify for the loan.
> MR. STORINO: What did she say in response?
> THE WITNESS: She asked me why. I told her because the income was – his income was not sufficient to hold the property.
> MR. STORINO: Did she indicate whether or not he held back?
> THE WITNESS: She – yeah, then she said -- I think she asked me how much, you know, he said he made and I told her. And she said no, he makes more than that. Let me give him a call to let him know to tell you everything so that you can put it on the application. And I said okay. And so I called him back, I don't know if it was the same day or a little bit later that day, and then we had the conversation about the 15,000.

Id. at 669-71. The Trumbull Property loan application stated that Betts made $15,000 a month.

However, Betts's 2005 and 2006 tax returns reflected that he made nowhere near that amount.

Ross's candid testimony about how she, Betts and Betts-Gaston conspired to submit false loan documentation is further evidence of Betts-Gaston's intent to defraud the lenders.

In addition, Ross and Betts-Gaston lied on the loan documentation about Betts's intention to use the Trumbull Property as his second home. Betts-Gaston said that her father "would have just been like staying in the basement or something like that, just to make sure that he complied with what the lender was asking." Id. at 975. Betts was an options trader from Roselle, Illinois. He never lived in Spikes-Davis's basement, nor intended to. The loan was obtained upon a falsely stated income and a false statement regarding Betts's intended use of the property. Ross prepared the loan, but the manner in which Betts-Gaston recruited and used her father is further evidence that Betts-Gaston intended to deceive the lender on the Trumbull transaction.

Regarding the Howard Property, the government produced closing documents from the September 1, 2006 real estate transaction, in which Mr. Kmiec was listed as the seller and Bobbie Ross was listed as the buyer. Ross, on behalf of her mother, submitted a loan application stating that Bobbie Ross was buying an investment property, had been employed by EAE Management, Inc. for two years, made $4,100 in wages per month, and received another $813 per month in rental income. The rental income was actually the rent that Brennan paid to IJCN in order to remain in his home. The loan application stated that Bobbie Ross was contributing $12,500 as the down payment personally, not borrowed. IJCN's involvement was not listed on the loan application or the HUD-1 settlement statement.

Ross testified at trial that the information provided on Bobbie Ross's loan application was false. Her mother did not work at EAE Management, Inc., her mother did not make $4100 per month, her mother did not receive rental income from Brennan, and IJCN provided the down payment. After the fraudulent transaction, Bobbie Ross quitclaimed the deed on the Howard

14

Property to the IJCN trust for ten dollars. Betts-Gaston prepared the real estate documents needed to facilitate the Howard Property transaction; for example, she prepared the Warranty Deed that transferred the Howard Property from Mr. Kmiec to Bobbie Ross for ten dollars consideration. The lender, however, issued a $252,163.39 loan in the course of the Howard Property transaction. Ross testified that her and Betts-Gaston managed the company jointly and the Howard Property was one of the four transactions that her and Betts-Gaston orchestrated using IJCN. The details of the Howard Property transaction were only nominally different than the Trumbull Property. Ross's testimony and the Howard Property closing documents were merely portions of the circumstantial evidence presented against Betts-Gaston. Reviewing the evidence and drawing inferences from the scheme itself establish Betts-Gaston's specific intent to deceive the lender on the Howard Property transaction.

Betts-Gaston's statements to the ARDC, and at trial, reflect direct evidence of her intent to cheat and cause financial loss to the mortgage companies providing the loans in these transactions. Both Ross's testimony, and the real estate documents, corroborates Betts-Gaston's admissions. The direct and circumstantial evidence presented in this case demonstrates Betts-Gaston's intent to defraud the lenders. She orchestrated a scheme of encumbering title to the Trumbull and Howard Properties in a specific effort to evade the mortgage companies—potential creditors of ordinary prudence—from pursuing the collateral on the debts they were owed.

### ii. Betts-Gaston Intended to Defraud the Homeowners

Although Betts-Gaston may have exhibited pure intentions to help the homeowners when her and Ross founded IJCN, the actions she took in facilitating the scheme were unscrupulous. She presented Spikes-Davis and Mr. Kmiec with the false hope of avoiding foreclosure and avoiding mortgage payments for a substantial number of months. In reality, she transferred their

rights of homeownership through straw buyers to IJCN. There was no escrow account available for the homeowners' benefit. She and Ross maintained control over the homeowners' equity. The provisions of the trust gave her, via IJCN, full discretion to spend the homeowners' equity as she saw fit. When Spikes-Davis and Ms. Kmiec sought to regain control of their homes or the money they were due, Betts-Gaston verbally amended the terms of the IJCN program—the terms became more favorable to IJCN and the costs to the former homeowners went up. Regardless of Betts-Gaston's representations, the homeowners never received the equity funds that they were due.

Betts-Gaston told the homeowners entering into her foreclosure avoidance scheme that their equity proceeds from the sale of their homes would be held in escrow. However, she admitted at trial that she "did not set up an escrow account." Id. at 860. In the Trumbull Property transaction, Betts-Gaston confirmed that "IJCN never gave any of the equity to Sandra Spikes-Davis." Id. at 1011. After her brother's death, Mrs. Kmiec contacted Betts-Gaston regarding the Howard Property transaction, only to find out that her brother had been swindled. Initially, Betts-Gaston "wrote to Mitchelle Kmiec [and] said that there was money in an escrow account." Id. at 995. Betts-Gaston further explained that "the net proceeds from Mr. Kmiec's transaction were $82,766.29. From that we subtracted our program fee which was $41,101.67." Id. at 1004. Ms. Kmiec testified at trial, however, that Betts-Gaston never remitted any of the equity from the sale of her brother's house. The evidence of how Betts-Gaston used her company for substantial financial gain at the victim-homeowners' expense is also sufficient to establish her intent to defraud.

The testimonial excerpts provided in this Opinion, which show Betts-Gaston's intent to defraud, are only a fraction of the evidence that the government adduced during the trial. The

numerous loan and real estate closing documents corroborated the testimony and provided circumstantial evidence that the scheme was designed to defraud persons of ordinary prudence and comprehension. Given the evidence presented at trial, a rational trier of fact could have found beyond a reasonable doubt that Betts-Gaston intended to defraud both the lenders and the homeowners associated with the Trumbull and Howard Properties.

### c. Evidence that Interstate Wires were Used in Furtherance of the Scheme to Defraud—Banks Outside of Illinois Funded the Loans

Finally, the Court turns to the third element of wire fraud—the use of interstate wires. Betts-Gaston's argument is once again a non-starter. The current state of the law on the use of a wire transmission requires that the interstate wire "only be incident to an essential part of the scheme." United States v. Powell, 576 F.3d 482, 493 (7th Cir. 2009) (quoting United States v. Turner, 551 F.3d 657, 666 (7th Cir. 2008)) (internal quotations omitted). The wire transmission need not be sent by defendant personally and "need not contain false or fraudulent material," it only needs to further the fraudulent scheme. Id.

At no time has Betts-Gaston denied that the Trumbull and Howard transactions closed and the resulting loans were not funded. In addition to the documentary evidence presented in this case, three people testified about the wire transfers that occurred as a result of the scheme. Gold, a senior special investigator for the Federal Reserve Bank of New York, explained the general logistics behind wire transfers and testified about the specific details of the wire transfers associated with the Trumbull and Howard transactions. Gold testified that on July 28, 2006, the Bank of New York initiated a wire transfer in the amount of $180,614.05 to Founders Bank. On that transaction, American Home Mortgage Corporation was listed as the originator of the wire transfer and Lawyers Title Insurance Corporation was listed as the beneficiary. Gold also

testified that a wire transfer initiated by Founders Bank to JP Morgan Chase was executed on September 1, 2006 in the amount of $252,163.39.

Gail O'Hanley, a closing agent who worked on the Trumbull Property transaction, corroborated Gold's investigation when she recognized Government exhibit 102 as "a wire -- incoming wire to the company, to Lawyers Title, from American Home Mortgage." Id. at 277. Arevalo, who was a former employee of Fremont Investment & Loan, also corroborated Gold's investigation by testifying that the company used interstate wires to perform the underwriting process for the loan on the Howard Property transaction and that the loan was eventually approved for $252,163.39. There was ample documentary and testimonial evidence presented throughout trial to show that interstate wires were used in furtherance of Betts-Gaston's fraudulent scheme. A rational trier of fact could find, beyond a reasonable doubt, the third element required to sustain Betts-Gaston's wire fraud conviction.

In conclusion, the bulk of the evidence to support her conviction came from Betts-Gaston herself—her sworn testimony to the ARDC and her testimony from the witness stand at trial. For the reasons stated above, the Court finds that the government introduced sufficient evidence at trial of the three essential elements of wire fraud to convict Betts-Gaston on Counts I and II of violating 18 U.S.C. § 1343. Accordingly, the motion pursuant to Rule 29 is denied.

### B. Betts-Gaston's Motion Under Rule 33

#### 1. Standard of Decision for a Motion Pursuant to Rule 33

"If the complete record, testimonial and physical, leaves a strong doubt as to the defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal, the district judge may be obliged to grant a new trial." United States v. Santos, 20 F.3d 280, 285 (7th Cir. 1994) (quoting United States v. Morales, 910 F.2d 467, 468 (7th Cir. 1990)). Rule 33 of the

Federal Rules of Criminal Procedure states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). However, "'[a] jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.'" Santos, 20 F.3d at 285 (quoting Morales, 910 F.2d at 468). The Court reweighs the evidence and may grant a new trial if the jury's "verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." United States v. Washington, 184 F.3d 653, 657 (7th Cir. 1999).

**2. Defendant Is Not Entitled to a New Trial**

Before continuing, the Court must note that the present motion was signed and submitted on behalf of Betts-Gaston by her retained counsel, Jennifer Bonjean ("Bonjean"). Bonjean also represented Betts-Gaston at trial. The distinction between Betts-Gaston and her attorney must be made given Bonjean's conduct at trial and the continued frivolous nature of the arguments made in this post-trial motion. To support her position that a new trial is warranted, Bonjean presents a laundry list of ten separate arguments, and under those ten, she presents several sub-arguments. These arguments predominantly constitute renewed objections to the Court's evidentiary and procedural rulings made before and during trial. Like her argument under Rule 29, Bonjean's arguments lack any citation to the record and only a rare citation to legal authority. These types of thinly-spread and underdeveloped arguments are routinely considered by the Court as a defendant's waiver of the argument. See Alden, 527 F.3d at 664; Berkowitz, 927 F.2d at 1384. Despite the vague assertions made by Bonjean, the Court remains diligent in adjudicating the motion in the interest of justice. Additionally, many of Bonjean's arguments are misleading and require a response from the Court to provide clarity, notwithstanding the flagrant legal inadequacies of Bonjean's arguments.

### a. Objections to the Court's Pre-Trial Rulings

The Court received this two-defendant case upon a transfer by the Executive Committee from the Honorable Milton I. Shadur on December 22, 2014; over three years after the indictment, and about seven months before the trial was set to begin. Upon transfer, several pretrial evidentiary matters were already fully briefed and awaiting decision. On March 12, 2015, the Court issued a written order allowing the government to admit co-conspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E) and United States v. Santiago, 582 F.2d 1128 (7th Cir. 1978), commonly referred to in this Circuit as a Santiago Proffer. Additionally, Betts-Gaston moved to present an expert who would have testified about the unethical, and sometimes illegal activities, that were rampant in the mortgage industry during the time of Betts-Gaston's scheme. The Court found the proposed expert's testimony inadmissible pursuant to Federal Rules of Evidence 401 and 403 in a written order on April 27, 2015. At that point, Betts-Gaston's case appeared to be a routine and straightforward mortgage fraud case. What would set this case apart from the ordinary, however, was the cantankerous conduct of Bonjean.

Before a jury was selected on the first day of trial, Bonjean argued orally for reconsideration of the Court's ruling that barred the defense's proposed expert from testifying. The Court found Bonjean's renewed argument unpersuasive. Additionally, the Court quickly realized that Bonjean was unfamiliar with the Federal Criminal Code and Rules. This excerpt is an example:

> THE COURT: That is what your expert will say?
> MS. BONJEAN: My expert will say that -- I don't want to overstate what my expert will state. That's a reasonable inference what my expert --
> THE COURT: That's why I'm asking you the question.
> MS. BONJEAN: If you want to know what my expert will testify to --
> THE COURT: Well, did he put that in a Rule 16 submission?
> MS. BONJEAN: I sent a letter to the government outlining his testimony. Yes, I did, your Honor.

THE COURT: Are you saying he complied with Rule 16?

MS. BONJEAN: I believe we did comply with Rule 16.

THE COURT: In what respect? How did you comply with that rule?

MS. BONJEAN: The government was notified of the nature of his testimony in specific --

THE COURT: In a letter?

MS. BONJEAN: In the letter.

THE COURT: You think that letter complies with Federal Rule of Criminal Procedure 16(a)(1)(G)?

MS. BONJEAN: I believe it complies substantially with the rule, yes.

THE COURT: It does? That brief letter?

MS. BONJEAN: Well, your Honor, I would have happily given more if the government asked for it and if the Court didn't --

THE COURT: Well, it's not a question of what the government asks for. It's compliance with the rule.

MS. BONJEAN: Well, your Honor, this Court denied, even finding it not relevant -- again, I believe we complied with the rule. We gave the government notice of what the expert would testify to.

THE COURT: Given your statements of all the things that he would testify to under his claim of expertise, are you saying that that simple letter complied with Federal Rule of Criminal Procedure 16(a)(1)(G)?

MS. BONJEAN: Your Honor, I will read from the letter.

THE COURT: You don't have to read from the letter. I have read it. I'm asking you --

MS. BONJEAN: Yes. I believe that it complies with our notice requirements under Rule 16, yes, I do.

THE COURT: If you want to read the letter, go ahead.

MS. BONJEAN: As to salient points, Mr. Wyatt would testify --

THE COURT: I'm not asking salient points. You said you were going to read the letter.

MS. BONJEAN: I'm not -- your Honor, I was going to point out in the letter --

THE COURT: If you are going to read the letter, read the letter.

MS. BONJEAN: The letter speaks for itself.

THE COURT: You choose not to read it into the record?

MS. BONJEAN: It's part of my motion. I think it will make its way into the record.

THE COURT: All right. So you don't want to read it into the record?

MS. BONJEAN: No, I don't want to read it into the record.

THE COURT: But the point you're saying is that that simple letter would form the basis for all these opinions that you say he would want to express, and that somehow that letter complies with 16(a)(1)(G)?

MS. BONJEAN: I believe that the letter summarizes what I have set forth in court here today, yes. I didn't realize that Rule 16 required an expert report, per se, in a detailed fashion.

Tr. at 8-9. Bonjean was reluctant to admit her errors. Her argumentative response regarding her compliance with a relatively simple procedural rule was a harbinger of her conduct to come at trial.

It was quickly apparent that Bonjean desired to obfuscate the Court's questions instead of candidly answer. Moving forward with the proceeding, the Court heeded the Supreme Court's precedent about how to manage unruly defense counsel, which states:

> We emphasize that the trial judge has the responsibility to maintain decorum in keeping with the nature of the proceeding; "the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct." Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). The judge "must meet situations as they arise and [be able] to cope with ... the contingencies inherent in the adversary process." Geders v. United States, supra, 425 U.S., at 86, 96 S.Ct., at 1334. Of course, "hard blows" cannot be avoided in criminal trials; both the prosecutor and defense counsel must be kept within appropriate bounds. See Herring v. New York, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975).

United States v. Young, 470 U.S. 1, 10-11 (1985). It is with this guidance that the Court conducted the trial.

The Court proceeded to rule on the remaining motions *in limine* and a jury venire was sworn. The Court conducted the jury *voir dire* in a manner consistent with Rule 24 of the Federal Rules of Criminal Procedure. The Court asked questions to solicit information on the jurors' backgrounds and probed further when a particular juror's responses warranted additional inquiry.

In her post-trial motion, Bonjean makes a couple general arguments about the Court's jury selection process and one specific argument styled as her "Second" argument. Def.'s Post-Trial Mot. at 4. Regarding her general arguments, the Court cannot discern to what prospective jurors or where in the transcript Bonjean is referring, and finds that these arguments are waived. Alden, 527 F.3d at 664; Berkowitz, 927 F.2d at 1384. Her specific argument is that the Court removed prospective juror Hany Abutaleb ("Abutaleb") because he was "of Arab descent."

Def.'s Post-Trial Mot. at 5. The Court excused Abutaleb, a man with two masters degrees (one from New York Institute of Technology) and a resident of the United States since 1997, because when the Court asked: "Do you accept the fundamental proposition of our law that the government has the burden of proving the guilt?" Abutaleb answered, "No." Tr. at 101. Furthermore, at the sidebar discussing whether Abutaleb should be dismissed for cause, all parties agreed, even Bonjean:

> MS. BONJEAN: I join in the cause but I have a separate objection.
> THE COURT: You join in the cause?
> MS. BONJEAN: I join in the cause, yes.
> THE COURT: All right. He is excused for cause.

Tr. at 115. The selection process resulted in a diverse jury composed of men and women from several different racial backgrounds. The Court finds that Betts-Gaston was convicted by a fair and impartial jury composed of her peers and this argument is without merit.

Bonjean also raises the argument that Betts-Gaston was denied a fair trial because Bonjean's non-attorney assistant could not sit at the counsel's table. Once again outside the presence of the jury, the Court instructed that Bonjean's assistant "must leave counsel table. She can sit in a pew." Tr. at 3. The pew is less than five feet from counsel's table. Bonjean then asked, "Can she help with documents, though?" Id. The Court reiterated, "She may sit in a pew. Not at counsel table." Id. Bonjean did not object but said, "Okay. Very good, your Honor." Id. Nothing more about the assistant's presence and function was discussed after that brief exchange. Bonjean now states that the Court "refused to allow defense counsel's non-attorney assistant to sit at counsel table to assist with the documents and electronic presentation of evidence, since it is exceptionally challenging to conduct an effective and smooth cross-examination while simultaneously locating and attempting to project documents to the jury." Def.'s Post-Trial Mot. at 3. The Court never issued such a ruling barring the assistant from

aiding defense counsel. Any difficulty that Bonjean experienced was self-inflicted. Bonjean's assertion is a misrepresentation of the Court's ruling and is not grounds for a new trial.

### b. Objections During the Presentation of Evidence

After jury selection, the jury heard opening arguments and the government proceeded with its case in chief. Bonjean raises no objections regarding opening statements in her post-trial motion.

Bonjean's "First" and most developed argument in her post-trial motion is that Betts-Gaston "was denied a fair trial in violation of her Due Process guarantees under Bracy v. Gramley, 520 U.S. 899, 904-05 (1997)." Def.'s Post-Trial Mot. at 2. The Bracy decision is the only case that Bonjean cites for support in her entire Rule 33 motion. Bracy involves a 28 U.S.C § 2254 habeas corpus petition arising from Bracy's conviction for murder and sentence to death by Illinois state court judge, Thomas J. Maloney. See Bracy v. Gramley, 520 U.S. 899 (1997). After Bracy was sentenced, Maloney was convicted as part of "Operation Greylord," the federal investigation of state judicial corruption. Id. at 901-02. Maloney solicited bribes in return for favorable rulings. See United States v. Maloney, 71 F.3d 645 (7th Cir. 1995). The two pages that Bonjean cites for authority, Bracy, 520 U.S. at 904-05, addresses the extent of discovery available to a habeas corpus petitioner under Rule 6(a) of the Rules Governing § 2254. The Court finds Bracy completely misplaced from the facts and procedural posture of this case.

The basis of Bonjean's first argument is that the Court harbored a bias or prejudice towards Betts-Gaston. Bonjean states: "From the beginning, the trial judge evinced a strong pre-judgment of the case and a bizarre hostility to the defense that pervaded the entire trial and left the jury with the clear message that the Court had already concluded that Defendant was guilty of the charges and that the jury should conclude the same." Def.'s Post-Trial Mot. at 2. After

review of the record, the Court finds that this argument amounts to nothing more than an empty accusation.

By rule, the Court has explicit authority to control the presentation of evidence during trial. See Fed. R. Evid. 611. By precedent, the Court has "wide discretion to determine the role that [it] will play during the course of a trial." United States v. Washington, 417 F.3d 780, 783 (7th Cir. 2005) (citation omitted). "A district judge is free to interject during a direct or cross-examination to clarify an issue, to require an attorney to lay a foundation, or to encourage an examining attorney to get to the point." Id. at 784 (citing Fed. R. Evid. 614(b); United States v Reynolds, 189 F.3d 521, 528 (7th Cir. 1999)). However, the Court "must refrain from 'assum[ing] the role of an advocate for either side." Id. (quoting United States v. Martin, 189 F.3d 547, 553 (7th Cir. 1999). Reversible error could occur if the Court "conveyed a bias regarding the defendant's honesty or guilt," and the defendant "has shown serious prejudice" resulting from the Court's comment. Id.

Bonjean argues that the Court abdicated its role as an impartial jurist and advocated for the government, however, she does so without reference to a precise instance. The Court issued hundreds of rulings over the course of the trial, sometimes prompted by an objection from Bonjean, other times on objection from the government, and at times on its own initiative. Despite her failure to cite to the trial transcript, the Court has done its best to address the argument. The following excerpts exemplify the impartial judicial rulings that the Court made throughout the trial.

Here is an example of the Court's ruling when Bonjean objected; the government was asking ARDC Investigator Kepler about Betts-Gaston's prior sworn statement when this objection was lodged:

25

> MS. BONJEAN: Objection. Leading, foundation, hearsay.
> THE COURT: You asked some questions before the break with respect to the timing of this, did you not?
> MR. LEE: Yes, your Honor.
> THE COURT: To make it clear and for clarification, start fresh in terms of when this occurred.

Tr. at 362-63. The Court plainly required the prosecutor to lay a better foundation, there was nothing impermissible about the above exchange. This is an example of the Court ruling on an objection raised by the government during Bonjean's cross-examination of Hamb:

> MR. STORINO: Objection. Hearsay.
> THE COURT: Sustained.
> MS. BONJEAN: Objection -- I'm sorry -- hearsay?
> THE COURT: Are you offering this for the truth of the assertion?
> MS. BONJEAN: No. I'm offering it for the intent and the mindset of the person who is listening to it.
> THE COURT: Who is that?
> MS. BONJEAN: The person that she told.
> THE COURT: Well, lay a foundation for the conversation: who, what, where, when.

Tr. at 478. Once again, nothing about the Court's ruling was unusual or exhibited bias towards Betts-Gaston's honesty or guilt. Similarly, when the Court interjected on its own, without an objection from counsel, it was to require counsel to lay a better foundation for the aid of the juror's understanding of the evidence. For example, on its own initiative the Court interjected during the government's direct examination of Hamb and instructed the government to "[l]ay a foundation in terms of the ability of this witness to observe, to see and hear what was going on. We need a better foundation." Tr. at 458. This was one of the many ordinary interruptions from the Court, permissible under Fed. R. Evid. 611(a). The record is replete with judicial interactions and rulings of this nature. At no time did the Court impart a bias towards Betts-Gaston's honesty or guilt.

Bonjean also claims that "[t]he Court on multiple occasions commandeered the Government's examination of witnesses, acting as an advocate rather [sic] an impartial and unbiased referee." Def.'s Post-Trial Mot. at 3. Bonjean does not provide an example of one of these "multiple occasions." The Court presumes that the following excerpt is one of the instances that Bonjean claims that the Court assumed the role of an advocate for the government because of how Bonjean reacted to the Court's question during trial. In this instance, the Court asked victim-homeowner Brennan two questions after Bonjean finished cross-examining him:

> MS. BONJEAN: One more second. I have nothing further.
> MR. LEE: Nothing on redirect.
> THE COURT: Mr. Brennan, after you signed the various documents to which you have referred, did the defendant give you copies of the completed documents?
> THE WITNESS: Yes.
> THE COURT: You took them with you?
> THE WITNESS: Yes, sir.
> THE COURT: Okay. Any further questions?
> MS. BONJEAN: I'm sorry, your Honor. I didn't realize the Court was doing recross for the government.
> THE COURT: What did you just say?
> MS. BONJEAN: It didn't hear the question that was answered. I realize you were questioning --
> THE COURT: What is it you just said?
> MS. BONJEAN: I -- are you questioning the witness? I didn't realize that it was going on.
> THE COURT: What is it you just said before that?
> MS. BONJEAN: I didn't realize you were doing recross for the government. They didn't ask to do any, and I heard the Court -- I just realized you were questioning the witness.
> THE COURT: Is it your position that a federal judge cannot ask questions of a witness?
> MS. BONJEAN: No, your Honor. Not at all. I just didn't hear it. I'm sorry. I didn't hear that -- I heard the government say they didn't have anymore questions, and then I didn't realize the Court was going to be asking questions in lieu of the government asking questions. That's all I meant, your Honor.
> THE COURT: In lieu of?
> MS. BONJEAN: Yes, your Honor.
> THE COURT: Do you persist in your aspersion?
> MS. BONJEAN: I'm not aspersion. Your Honor, the Court clearly has the authority to do whatever it likes. There is -- there is nobody that would disagree with that.

THE COURT: I would.

MS. BONJEAN: Okay. Well, your Honor --

THE COURT: It isn't that the Court can do anything it likes. That's not the point and you may be seated.

MS. BONJEAN: Thank you.

THE COURT: You may step down, Mr. Brennan.

Tr. at 525-26. In the above excerpt, the Court asked two questions to clarify whether Betts-Gaston gave Brennan copies of documents from his real estate transaction. The answers given helped Betts-Gaston's defense not hurt it; they did not prejudice Betts-Gaston in any discernable way. These questions clarified an issue, which is permissible under Fed. R. Civ. P. 614 and Washington, 417 F.3d at 784. Bonjean ridiculed the Court without reason and the Court responded to maintain decorum in the courtroom, as is required by Young, 470 U.S. at 10. Despite Bonjean's outbursts, the Court did not exhibit any bias towards Betts-Gaston.

This aspersion from Bonjean was not an isolated incident. There were numerous eruptions from Bonjean designed to goad a biased response from the Court. A review of the transcript reveals that the Court limited its interactions with defense counsel to issuing judicial rulings and taking efforts to keep Bonjean's conduct within appropriate bounds. The Court did not comment on Betts-Gaston's honesty or guilt and did not advocate on behalf of the either of the parties. The Court's administration of the trial was fair and even-handed.

On occasion, the Court even aided the defense by prompting Bonjean for an objection to the line of questioning from the government. When the government was effectively impeaching Betts-Gaston, the Court interrupted and said, "Before you move on to another area, Miss Bonjean, if there is a 106 issue, you may proceed." Tr. at 989. But Bonjean responded, "I have no -- the government may proceed. I don't have a 106 issue at this time." Id. Despite Bonjean's rude attacks, the Court remained courteous. The Court was steadfast in governing the presentation of evidence fairly, impartially, and according to the Federal Rules.

Bonjean also claims that the Court excessively admonished her, arguing that the Court even criticized her use of "thank you." Def.'s Post-Trial Mot. at 3. This passage reflects an instance when the Court did instruct Bonjean that she need not thank the Court for ruling:

> MS. BONJEAN: Okay. May I approach the witness?
> THE COURT: For what purpose?
> MS. BONJEAN: To have her authenticate the closing instructions.
> THE COURT: Yes.
> MS. BONJEAN: Thank you.
> THE COURT: You need not say "thank you" after the Court rules.
> MS. BONJEAN: All right, Judge.
> THE COURT: Or "all right, Judge," as well.
> MS. BONJEAN: I'm handing you what's been previously marked --
> THE COURT: Did you hear what I said?
> MS. BONJEAN: -- Defendant's Exhibit 1.
> THE COURT: Did you hear what I said, counsel?
> MS. BONJEAN: Yes, your Honor, I did.
> THE COURT: Please proceed.

Tr. at 289. The Court reprimanded the government's counsel similarly:

> MR. LEE: Your Honor, the government moves to admit Government Exhibit 62.
> THE COURT: It is received. It may be published.
> MR. LEE: Thank you, your Honor.
> (Government Exhibit 62 received in evidence.)
> MR. LEE: May I --
> THE COURT: Thank-you's are not required when the Court rules.

Tr. at 295. Bonjean is correct that the Court admonished her to use professional decorum in the courtroom, but the Court did the same for the government's counsel. When it was appropriate, the Court admonished Bonjean. For example, when Bonjean was antagonizing Spikes-Davis, the Court interjected by telling Bonjean: "You are shouting at the witness. Lower your voice, please." Tr. at 434. Review of the transcript shows that the Court was fair and its criticisms of attorneys for both sides did not result in any prejudice to Betts-Gaston.

Bonjean argues that the Court issued rulings that disparaged her personally, but she does not articulate how these rulings prejudiced her client or cite to the record. While the rulings that

the Court issued during trial tended to be stern, these rulings were impartial, did not exhibit bias, and merely enforced evidentiary rules. A review of the record reflects that none of the Court's comments conveyed a bias towards Betts-Gaston's honesty or guilt. Accordingly, Bonjean's argument for a new trial on the basis that the Court was critical of her is meritless under the standard set forth in Washington, 417 F.3d at 784.

Additionally, while Bonjean was never prevented from filing motions, raising objections, or cross-examining witnesses, she never moved to recuse the trial judge, which is governed by the precedent set in Liteky v. United States, 510 U.S. 540 (1994). The Liteky Court recognized that "[t]he judge who presides at trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings...." Id. at 550-51. The Supreme Court's statement accurately summarizes what occurred in this trial. Any ill disposition the Court exhibited towards Betts-Gaston was formed from viewing the overwhelming evidence of her deceitful and illegal business practices; evidence that the government produced during trial. Yet, the Court was resolute in adhering to its duty to issue judicial rulings based on sound legal precedent. The Court never injected extrajudicial comments or opinions into the trial.

Since Liteky, the Seventh Circuit has reiterated that:

Judges have discretion in running their cases, and "[a] judge's ordinary efforts at courtroom administration ... remain immune" from charges of partiality, even if the judge exhibits "impatience, dissatisfaction, annoyance, and even anger." Effective case management sometimes calls for such warnings to avoid waste of time and distraction from the principal issues.

In re City of Milwaukee, 788 F.3d 717, 723 (7th Cir. 2015) (quoting Liteky, 510 U.S. at 555-56); see also United States v. Robbins, 197 F.3d 829, 848 (7th Cir. 1999). Here, the Court took ordinary efforts to administer the trial. Bonjean's crass accusations saying otherwise are without support either in the law or in the transcript. Therefore, a new trial pursuant to Rule 33 on the basis that the Court was unfair or impartial is not warranted.

As part of her "Second" argument, Bonjean argues that the Court erred by discharging two jurors who claimed to be ill. "Rule 24(c) of the Federal Rules of Criminal Procedure allows the district judge to replace with alternatives any jurors who become or are found to be unable or disqualified to perform their duties. The decision to remove a juror under this rule is committed to the sound discretion of the trial judge, and there is no abuse of discretion if the record shows some legitimate basis for his decision." United States v. Doerr, 886 F.2d 944, 970 (7th Cir. 1989) (citations omitted). A juror's complaint of illness is a legitimate reason to replace him or her. Id. at 971. Here, the first juror called the Court and complained of "stomach flu." Tr. at 738. The second juror also called the Court and said "[s]he doesn't know if it was something she ate, but she woke up this morning not feeling well." Id. at 959. The Court heard arguments from both sides on each occasion and provided detailed explanations why it decided to replace each juror with an alternate. No rule compels the Court to investigate the juror's illness or to adjourn the trial. The jurors' representations to Court were legitimate reasons to discharge them. "Moreover, 'some showing of prejudice is ordinarily necessary before a conviction will be overturned on this ground.'" Doerr, 886 F.2d at 971 (quoting United States v. Peters, 617 F.2d 503, 505 (7th Cir. 1980)). Bonjean provides no showing of prejudice. This argument is without merit.

Bonjean's argument labeled as "Third" regarding the defense's proposed expert witness is still unpersuasive. See Def.'s Post-Trial Mot. at 5. The Court thoroughly explained in its April

27th Order, and again on the day of trial, why the proposed expert could not testify. The Court will not belabor this issue for a third time. Also in her "Third" argument, Bonjean says that she was denied "the right to cross examine witnesses on the materiality of the alleged misrepresentation." Def.'s Post-Trial Mot. at 5. This assertion is so vague and so absurd that it warrants zero additional discussion.

Next, Bonjean's "Fourth" argument is that she did not have the ability to "confront witnesses" testifying against her client because the "entire" transcript from the prior ARDC investigation was admitted without her being able to object. Def.'s Post-Trial Mot. at 6. However, according to the government's response brief, Bonjean received a copy of "the transcript and the related exhibits" on April 8, 2015, three months before trial. Govt's Resp. at 14. Bonjean filed no motions objecting to the government's use of the ARDC transcript prior to trial. Regardless of Bonjean's nonfeasance, Betts-Gaston's statements were not hearsay under Fed. R. Evid. 801(d)(2), Kepler's statements were not offered for the truth of the matter, and the statements of both individuals were relevant to Betts-Gaston's intent to defraud under Rule 401. Additionally, the government did not introduce the entire ARDC transcript into evidence; portions of the transcript were redacted to comply with the Court's pre-trial rulings on the parties' motions in limine. Furthermore, Bonjean cross-examined Kepler, the individual who investigated Betts-Gaston for the ARDC, and only asked a total of eighteen questions before concluding "Okay. Thank you. I have nothing further." Tr. at 369. Bonjean's "Fourth" argument is wholly without merit and misrepresents what actually occurred in this proceeding.

Bonjean's "Fifth" argument is equally preposterous. She argues, in total, that "the trial court erred when the Court unfairly denied or limited defense counsel's cross-examination of Government witnesses Spikes-Davis, Surrina Hamb, Norman Ikonen, Dimona Ross, and

32

Mitchelle Kmiec." Def.'s Post-Trial Mot. at 6. She does not elaborate on how or when her cross-examinations were denied or limited. First, Bonjean cross-examined and recrossed Spikes-Davis and Bonjean's line of questioning only ended because she said, "I have nothing further." Tr. at 452. Second, Bonjean's examination of Hamb ended only after the Court asked Bonjean, "Is cross completed?" and Bonjean responded unequivocally, "Yes." Tr. at 494. There was nothing erroneous or unfair about the extent of Bonjean's questioning of these witnesses.

Third, the Court did limit Bonjean's examination of Ikonen; it limited her recross-examination after extensive opportunity to confront the witness. Ikonen was a former mid-level employee for one of the victimized lenders, whose testimony was cumulative and inconsequential. Reviewing the transcript shows that the government's direct examination of Ikonen predominantly solicited information regarding Bobbie Ross's loan application on the Howard Property. The direct examination is fifteen pages in length in the transcript. Bonjean's cross-examination of Ikonen then lasted over twenty-eight pages before she concluded, "I have nothing further." Tr. at 571. The government's redirect consists of two pages, totaling four questions, about Bobbie Ross's loan application; how there was no indication on the form that Bobbie Ross borrowed or was given the funds for the down payment. Bonjean's recross-examination of Ikonen, however, goes on for another six pages in the transcript asking questions about Bobbie Ross's loan application that the government did not address on redirect. The Court stopped Bonjean's recross-examination when her questioning was outside the scope of the government's four questions on redirect, was wasting time because it was redundant of earlier questions to the witness, and it appeared to have the sole purpose of harassing Ikonen. The Court's ruling triggered this response from Bonjean:

> I am not done with my cross-examination. You are violating my client's Sixth Amendment rights to have a cross, have this witness crossed. That is absolute abdicating your job as a judge.

Id. at 580. Bonjean's censorious outburst, all in the presence of the jury, continued:

> I object to not being permitted to continue my cross-examination because the Court apparently doesn't like the testimony coming into the record, which will be on the transcript.

Id. After the Court sustained the government's objection to Bonjean's comments, the next witness was called.

Bonjean, exercising the rights of her client Betts-Gaston, has no right to unlimited recross-examination of the government's witnesses. See Delaware v. Fensterer, 474 U.S. 15, 20 (1985). Bonjean was not asking questions implicating Ikonen's credibility or bias. Cf. United States v. Martin, 618 F.3d 705, 727 (7th Cir. 2010) ("Cross-examination designed to elicit witness bias directly implicates the Sixth Amendment."). "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Fensterer, 474 U.S. at 20. Bonjean's questions plainly fell within the category of questions that the Court can, and should, limit. The Court's limitation of Bonjean's recross-examination was well within its discretion under Fed. R. Evid. 611(a). See also United States v. Hayward, 6 F.3d 1241, 1251 (7th Cir. 1993), overruled on other grounds by United States v. Colvin, 353 F.3d 569 (7th Cir. 2003). Bonjean's argument that her "cross-examination" of Ikonen was "unfairly denied or limited" is disingenuous and a misrepresentation of the record.

Similar to Spikes-Davis, Bonjean's recross-examination of Ross ended with her saying, "I have nothing further." Tr. at 762. And finally, the Court was completely silent during

Bonjean's cross-examination of Ms. Kmiec; the line of questioning ended when Bonjean said, "Okay. Thank you," and sat down. Tr. at 619. The entirety of this "Fifth" argument is frivolous. Bonjean is admonished for her failure to comply with the Circuit's Standards of Professional Conduct requiring lawyers to "not knowingly misrepresent, mischaracterize, misquote, or miscite facts or authorities in any oral or written communication to the court." Standards for Professional Conduct Within the Seventh Circuit Federal Court. Lawyers' Duties to the Court. http://www.ilnd.uscourts.gov/HOME/_assets/_documents/rules/spc_pg3.pdf (last visited September 9, 2015). Bonjean misrepresents the fact that any limitation of her inquiry of government witnesses occurred on recross-examination, not an initial cross-examination.

Moving to Bonjean's "Sixth" argument that Betts-Gaston was denied a fair trial "when during counsel['s] cross-examination of Surrina Hamb the Court *sua sponte* ruled that defense counsel had misstated the evidence when she asked Hamb whether Defendant had Ms. Spikes-Davis [] sign[] blank pieces of paper." Def.'s Post-Trial Mot. at 6. Bonjean's argument about "blank pieces of paper" is a ploy to create a red herring and requires the following background.

Turning to the transcript reveals that when Spikes-Davis reviewed the government's Exhibit 34, she said:

> I recognize my signature on the document. A lot of the documents were not completed or filled out. I just signed a lot of blank documents, and she advised me not to put any dates or anything on them, and that would come at the closing.

Tr. at 408-09. Spikes-Davis went on to elaborate what she meant by blank documents when the government asked a question to clarify what was on Exhibit 34 when she signed it; she said:

> The middle portion where it says owner, title policy, none of that was there. At the top, there was no seller owner name. There was no buyer. James Betts, I never heard of him. And there was no Betts signature on the bottom of the document as well. The only thing that was on here was my signature.

Tr. at 409. After viewing the displayed exhibit and hearing Spikes-Davis's testimony, it was

unassailable that the document was a boilerplate template with blank spaces that needed to be

filled in, it was not just a blank piece of paper.

Then on cross-examination, Bonjean pointed to Exhibit 33 and asked Spikes Davis "How

many times had you signed blank documents before you signed that one?" Tr. at 429. Her

response, "I've never signed blank documents." Id. Then a second time, Bonjean asked Spikes-

Davis about signing blank documents, this time showing her a copy of the lease she signed:

> MS. BONJEAN: Is it your testimony that that caption, Residential Lease
> Agreement and Option to Purchase, was not there when you signed it?
> THE WITNESS: It was there.
> MS. BONJEAN: That was there?
> THE WITNESS: Yes.
> MS. BONJEAN: But you testified previously that "lessee" was not there?
> THE WITNESS: No.
> MS. BONJEAN: It wasn't there?
> THE WITNESS: I didn't say that.
> MS. BONJEAN: Okay. Now it's your testimony that "lessee" was there?
> THE WITNESS: No. You asked me what was lessee and what was lessor. I did
> never say that it was not on the form. I said I signed a lot of blank documents.
> MS. BONJEAN: Okay. And, ma'am, just to be clear, your testimony now is that
> lessee was there and when you signed under lessee, right?
> THE WITNESS: Yes. I signed it.

Tr. 434. Bonjean tried to badger or confuse Spikes-Davis into saying that she signed blank pieces

of paper. However, Spikes-Davis never said that she signed pieces of paper that were completely

blank or devoid of any text except for her signature.

After Bonjean painstakingly went through each blank space on the fraudulent bill of sale

for personal property that was used in conjunction with Spikes-Davis's real estate transaction,

finally this exchange occurred:

> MS. BONJEAN: So it was literally just a blank piece of paper you signed?
> THE WITNESS: Yes.
> MS. BONJEAN: And then everything was added after the fact?
> THE WITNESS: Yes.

> MS. BONJEAN: How many blank pieces of paper did you sign?
> THE WITNESS: In her office, a lot.

Id. at 437. These short answers appear to be the basis for Bonjean's current argument that the

Court's *sua sponte* ruling denied Betts-Gaston a fair trial.

Nonetheless, Bonjean's cross-examination continued until her obfuscation techniques

ultimately solicited a response from Spikes-Davis that Bonjean did not want:

> MS. BONJEAN: Well, you just looked at a document that was generated by the title company, correct?
> THE WITNESS: I did not receive a lot of documents until a month after the closing had occurred. I received a bunch of documents in the mail from Miss Betts-Gaston. All the documents I signed in her office were blank.
> MS. BONJEAN: Ma'am, there is no question pending.
> MR. STORINO: Objection, your Honor.
> MS. BONJEAN: There is no question pending.
> THE COURT: Sustained.
> MS. BONJEAN: I still haven't gotten an answer to my question.
> THE COURT: Just a minute. You may complete your answer.
> BY THE WITNESS:
> A. When I went to her office, I only had an hour. Every single –
> MS. BONJEAN: There is no question pending. Is this an opportunity for her to continue to lie from the witness stand?
> MR. STORINO: Your Honor, objection.
> THE COURT: Sustained. You may complete your answer.
> BY THE WITNESS:
> A. When I went to her office, I had an hour, because I had an hour for lunch. All the documents that I signed in her office were blank, and I signed those documents believing and trusting that she was an honest person because I had known Surina Hamb for more than 20 something years, and I never thought that anybody would do this to me or my family, to take our home from us.
> It was a very rough time. And I also had pointed out the fact to her that I thought she might have been related to me because my maiden name was Gaston, in her office.
> So yes, I trusted her. And I believed that she was an attorney that was going to represent me. And I was wrong.

Id. at 440-41. By the end of Bonjean's relentless cross-examination of Spike-Davis, Spikes-

Davis began to direct the questions to Bonjean. When Bonjean asked, "So every document that

memorialized that this was a sale, you are testifying under oath that it was a blank piece of paper

right?" Spikes-Davis's response was "Why don't you ask the defendant." Id. at 448. That

stopped Bonjean from asking anymore questions about the format and completeness of the

documents that Spikes-Davis signed. Bonjean omits all of the aforementioned background as she

claims in her motion that "the record shows that Spikes-Davis *had* in fact testified that she signed

blank pieces of paper." Def.'s Post-Trial Mot. at 6.

Surrina Hamb was the government's next witness to testify. Bonjean is correct that the

Court interjected during her questioning of Hamb, as the following passage reflects:

> MS. BONJEAN: Did you ever give Miss Spikes-Davis blank pieces of paper to
> sign?
> THE WITNESS: No.
> THE COURT: What's your understanding of a blank piece of paper?
> THE WITNESS: A piece of paper with nothing on it.
> THE COURT: A piece of paper with nothing on it.
> THE WITNESS: A piece of paper with nothing on it.
> THE COURT: Rephrase the question for clarification.
> BY MS. BONJEAN:
> Q. Miss Spikes-Davis testified that she essentially signed blank pieces of paper.
> Did you have her sign blank pieces of paper?
> THE WITNESS: Never.
> THE COURT: That misstates the evidence.
> MS. BONJEAN: Are you advocating for the government now?
> THE COURT: Your question misstated the evidence.
> MS. BONJEAN: No, it does not. The transcript will speak for itself and the jury
> knows.

Tr. at 488-89. After that outburst, Bonjean did not pursue the line of questioning much further.

Bonjean simply asked Hamb to identify the title of the bill of sale, which she recognized. Rule

611 allows the Court to "exercise reasonable control" over the examination of witnesses to aid in

"determining the truth." Fed. R. Evid. 611(a). Certainly, the Court did not abuse its discretion

when it asked the *sua sponte* clarification question to Hamb.

Bonjean even tried to use this red herring during her closing statement to assert this

proposition:

> Ladies and gentlemen, when you go out and you order Chinese food, and you come come and you eat it, and if you find a cockroach in your hot and sour soup, you don't just pull out the cockroach and throw it over your shoulder and keep eating your soap [sic]. You throw the whole soup out, because it's so infested with the nastiness of a cockroach. And that's what you have to do with Miss Spikes-Davis's testimony.
>
> You know she lied to you. She lied to all of us. And if she lied to us about one or two or three things, about signing blank documents, about never having seen the sales contract, never knowing about James Betts, then we don't know everything else she lied about, and you can't rely on her testimony to convict my client.

Tr. at 1115-16. The Court allowed Bonjean more flexibility in her closing argument, which is not evidence, and it did not interject during the portion of Bonjean's argument addressing Spikes-Davis's testimony. This portion of Bonjean's "Sixth" argument—that the Court's clarification Sandra-Davis's testimony deprived Betts-Gaston of a fair trial—is without merit.

Also part of her "Sixth" argument, Bonjean claims that the admission of Hamb's belief that Spikes-Davis was not actually selling her home deprived Betts-Gaston of a fair trial. As Bonjean did not cite any part of the record, the Court assumes that the following excerpt reflects the particular instance to which Bonjean is complaining. The government asked Hamb:

> MR. STORINO: Did you think, based on your perception and what you heard, whether Miss Spikes-Davis was selling her home --
> MS. BONJEAN: Objection.
> BY MR. STORINO:
> Q. -- to a person named James Betts?
> MS. BONJEAN: Irrelevant what she thought.
> THE COURT: You may answer the question.
> MS. BONJEAN: Objection. It's irrelevant, what she thought. It's highly prejudicial, what she thought.
> BY THE WITNESS:
> A. No.
> MS. BONJEAN: She wasn't the client.
> THE COURT: You may answer the question.
> BY THE WITNESS: A. No.

Hamb's answer to the government's question was admissible because the government framed the question within the context of Fed. R. Evid. 602, 701, and 401. Hamb had personal knowledge of

the transaction, had formed her own lay opinion, and the question was relevant to Betts-Gaston's intent to defraud Spikes-Davis. Bonjean was correct that Hamb's answer was highly prejudicial, but that it is not a reason to bar Hamb's answer under Rule 403 or any other Federal Rule of Evidence. Accordingly, this argument is meritless.

The "Seventh" argument Bonjean makes is that the Court erroneously admitted Exhibits 91 through 94. Exhibits 92 and 94 are letters signed by Betts-Gaston and sent to Ms. Kmiec; substantively admissible under Fed. R. Evid. 801(d)(2) as the statement of a party opponent. Exhibits 91 and 93 are letters that Ms. Kmiec sent to Betts-Gaston. The Court did not admit Exhibits 91 and 93 for the truth of the matter, but to provide context of the letters to the jury, and the Court contemporaneously instructed the jury accordingly. No error and no unfair prejudice resulted from these rulings, therefore, this argument is without merit.

The "Eighth" argument is that the statements "purportedly made by James Betts to Ross regarding his income" were erroneously admitted because the government "failed to lay a foundation for the hearsay evidence." Def.'s Post-Trial Mot. at 7. "For a co-conspirator's statements to be admissible under FRE 801(d)(2)(e), the government must establish by a preponderance of the evidence (1) that a conspiracy existed, (2) that the defendant and the declarant were members of the conspiracy, and (3) that the statements were made in the furtherance of the conspiracy." Pust, 2015 WL 4898976 at *3. Here, the Court ruled pretrial that the Government's Santiago Proffer sufficiently proved by a preponderance of evidence that Betts's statements were made in furtherance of the conspiracy and his statements would be admissible at trial. The evidence presented by the government solidified that ruling. The government proved (1) that a conspiracy existed for four real estate transactions, but it only sought convictions on two; (2) that Betts-Gaston, Ross, Bobbie Ross (Ross's mother), and Betts

(Betts-Gaston's father) were members of the conspiracy, but it only sought indictments for two of them; and (3) that Betts's statements to Ross fraudulently inflating his income, which were in turn represented on the loan application, were in furtherance of the conspiracy. Betts was an unindicted co-conspirator and his statements were admissible under Fed. R. Evid. 801(d)(2). This argument is meritless.

In the "Ninth" argument, Bonjean again calls into question the Court's impartiality. This time, arguing that the Court conducted a cross-examination of Betts-Gaston. The record reflects several innocuous questions from the Court to Betts-Gaston, such as, "I'm sorry. I didn't hear your last answer. You lived where?" Tr. at 813. The Court also asked Betts-Gaston to clarify which mortgage she was talking about when describing the details of the Trumbull Property transaction, saying "Help the jury understand, when you say a mortgage, saddled with, which mortgage?" Id. at 852. In response to this question Bonjean, rudely remarked, "If the Court would like to take off its robe and come down here and do the government's job for it, it certainly can do that." Id. Later the Court asked Betts-Gaston to clarify her attorney-client relationship with Spikes-Davis; for example, the Court asked, "When did you terminate your attorney client relationship?" Id. at 874. Betts-Gaston obfuscated the answer, so the Court asked follow-up questions. To clarify a conversation what was said in a conversation between Betts-Gaston and Mrs. Kmiec, the Court asked Betts-Gaston a simple foundation question, "What words did you speak and what words did she speak?" Tr. at 884. Bonjean again reacted with an outburst: "Objection. Unless the Court would like to become a litigant, I object to the Court's continuing harassment and questioning. You didn't do it for a single government witness, and you are up here doing it. It's unfair, it's improper and you know it." Id. There was nothing unusual or impermissible about the Court's questions to Betts-Gaston. The questions were well

within what is permissible under Fed. R. Evid. 614 and <u>Washington</u>, 417 F.3d at 784. The only peculiarities about the Court's questions were the resulting aspersions from Bonjean.

Bonjean also argues that the Court's deportment deprived Betts-Gaston a fair trial. Bonjean claims that the Court "repeatedly rolled his eyes and made facial expression[s] demonstrating his disbelief of [Betts-Gaston's] testimony." Def.'s Post-Trial Mot. at 7. A new trial is warranted only when the Court exhibits "a high degree of favoritism or antagonism." <u>Liteky</u>, 510 U.S. at 555. On the other hand, "judicial physical movements and responses during trial ordinarily do not support a motion for mistrial." <u>Robbins</u>, 197 F.3d at 848. And, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion." <u>Liteky</u>, 510 U.S. at 555.

Upon review of the transcript, the Court can only find a single, isolated incident of making a notable facial expression. <u>See</u> Tr. at 979-80. The Court's expression was a reaction to the absurdity of Betts-Gaston's answer. The Court contemporaneously instructed the jury to ignore any facial expression that the Court may have exhibited. This was not a high degree of antagonism towards Betts-Gaston, but a reaction to Betts-Gaston's bold efforts to make assertions completely contrary to the evidence in the case. Given the overwhelming evidence of Betts-Gaston's guilt, the slight aberration from the Court's otherwise stoic appearance does not warrant a new trial.

### C. Objections Regarding the Closing Arguments

Parts of Bonjean's "First" argument and her entire "Tenth" argument relate to what occurred after the close of evidence. Bonjean argues that Betts-Gaston was denied a fair trial when "the Court *sua sponte* sought to instruct the jury with an 'Ostrich' instruction *after*

Defendant completed her closing argument." Def.'s Post-Trial Mot. at 4. Reviewing the record

reveals that after the close of evidence, the Court followed procedural rules and Seventh Circuit

precedent to ensure that the jury was properly instructed on the law.

Bonjean's closing argument started with the bizarre preamble of "Look at me. I did it.

I'm proud of myself. Okay." Tr. at 1092. From there, she misstated the government's burden of

proof, necessitating the Court to interject:

> MS. BONJEAN: The jury is the anchor to hold the government to its burden, and
> that burden is a hefty burden. It is a burden that is proof beyond a reasonable
> doubt. All reasonable doubt.
> THE COURT: Just a minute. You have misstated the law.
> MS. BONJEAN: I have not misstated the law. It's proof beyond a reasonable
> doubt. You are misstating the law. It is proof beyond a reasonable doubt.
> THE COURT: Just a minute, counsel. Ignore the word "all," members of the jury.
> Please proceed.

Tr. at 1093. Then Bonjean went on to argue four times that Betts-Gaston did not knowingly

participate in the mortgage fraud scheme.

> Why is it so implausible that Avalon didn't know what Dimona was doing?
> …
>
> So why is it so implausible that my client didn't know what [Ross] was doing in
> her little home office when she was sending off these -- putting down whatever
> she wanted on these loan applications?
> …
>
> Why is it so implausible? Why is the government so convinced my client knew
> what was going on with Dimona Ross in her little home office with the little loan
> applications and her little deals going on with Norman Ikonen?
> …
>
> Why is it so implausible that my client didn't realize what was -- it wasn't her --
> by everyone's account, including the government's, she was not part of that
> process.

Tr. at 1128-29. During her closing argument, Bonjean raised the defense that Betts-Gaston did

not knowingly participate in the scheme. Because of Bonjean's closing argument, the Court

discussed the possible addition of the "Ostrich" instruction, also known as the second paragraph of the Seventh Circuit Pattern Jury Instruction Number 4.10. The discussion regarding the Ostrich instruction occurred outside the presence of the jury. Ultimately, the Court relied on United States v. Caliendo, 910 F.2d 429, 435 (7th Cir. 1990), and declined to provide the Ostrich instruction because "the evidence against the defendant points solely to direct knowledge of the criminal venture." Tr. at 1218; cf. Caliendo, 910 F.2d at 435 ("if the evidence against the defendant points solely to direct knowledge of the criminal venture, it would be error to give the [ostrich] instruction.") (internal quotation and citations omitted).

The Court did not err or deprive Betts-Gaston of a fair trial by discussing what set of jury instructions would be proper, especially because Bonjean had raised the issue of willful blindness during her closing argument. Betts-Gaston was in no way prejudiced by the ongoing discussion regarding proper jury instructions because "[t]he Court may instruct the jury before or after the arguments are completed, or at both times." Fed. R. Crim. P. 30(c). Furthermore, the Court's decision followed the explicit warning in Caliendo. Bonjean's assertion that "Defendant had a right to know how the jury would be instructed *prior* to closing argument" is yet another instance where she disregards the Federal rules and misrepresents legal authority. Def.'s Post-Trial Mot. at 4.

In her "Tenth" argument, Bonjean avers that the government misstated the law and facts during its closing argument. Bonjean does not specify which statements she is challenging. She does not even specify if the government's statements occurred during the initial closing argument or the rebuttal closing argument. The record reflects that Bonjean made a handful of general objections during the government's closing statements, but she does not do enough to preserve those objections here. Bonjean's argument that the government misstated the law and

misstated the facts during the closing arguments is waived. <u>Alden</u>, 527 F.3d at 664; <u>Berkowitz</u>, 927 F.2d at 1384.

Bonjean also argues as part of her "Tenth" argument that "AUSA Lee 'testified' as a Government expert witness during closing argument about what was routine in the mortgage industry." Def.'s Post-Trial Mot. at 7. Once again, she does not provide a citation to the record. When a prosecutor's closing remarks are challenged as inappropriate, "the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant." <u>Young</u>, 470 U.S. at 12 (citations omitted). A new trial is not warranted "where prosecutors have responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray." <u>Id.</u>

Here, Bonjean asserted, *inter alia*, during her closing argument that "mortgage lenders were giving loans to people who could not afford them and then turning around, selling them off, and foreclosing on them so they could enrich themselves. That's the scheme." Tr. at 1122. AUSA Lee's rebuttal closing predominantly focused on the witnesses' testimony presented during the trial, and he only briefly discussed the mortgage industry. When discussing the mortgage industry, he did so in the context of explaining why Betts-Gaston's misrepresentations were material. <u>See id.</u> at 1198-99. Furthermore, AUSA Lee told the jury that the Court "has instructed you that what the attorneys say is not evidence. What the attorneys say, what they argue is not evidence...." <u>Id.</u> at 1187. The Court later reiterated AUSA Lee's admonition by repeating: "What the attorneys say in their closing argument is their view of the evidence." <u>Id.</u> at

1191. AUSA Lee's quick discussion about the mortgage industry absolutely does not amount to testimony from an expert witness. Given the overwhelming evidence against Betts-Gaston, Bonjean's earlier inflammatory remarks, AUSA Lee's limited discourse of the mortgage industry in his rebuttal, and the accurate instructions that attorneys' closing arguments are not evidence, the Court finds that the prosecutor's response was reasonable and did not unfairly prejudice Betts-Gaston.

As a final remark, it is a rare occasion that Courts are confronted with such groundless and pestiferous accusations of impartiality from defense counsel. See United States v. LeFevour, 798 F.2d 977 (7th Cir. 1986). LeFevour is a case in which the defense counsel argued on appeal, among other things, that "the District Judge was the prosecution's most effective advocate." Id. at 984. The Seventh Circuit, however, held otherwise; noting that the District Judge's "occasional asperity..." was "entirely understandable in the view of the rude and provocative behavior of defense counsel...." Id. at 985. Bonjean's conduct throughout this proceeding was akin to the conduct of defense counsel in LeFevour. "The tactic of a lawyer in a losing cause who tries to provoke the trial judge into error is an old one"; it is a tactic of which the Court is well aware. Id. The tactic failed for defense counsel and his client in LeFevour and Bonjean's similar trial tactics have failed here. The motion for a new trial pursuant to Rule 33 is denied.

### III. Conclusion

At trial, the government produced overwhelming evidence of Betts-Gaston's guilt on Counts I and II of wire fraud in violation of 18 U.S.C. § 1343. The trial that Betts-Gaston received was fair. The Court's rulings during the course of the proceeding simply followed federal procedural rules, federal evidentiary rules, and controlling precedent. To the extent that Bonjean makes any other "arguments" on behalf of her client Betts-Gaston, the Court declines to

address them because they are merely undeveloped assertions void of any merit. Therefore,

Betts-Gaston's motion for acquittal pursuant to Rule 29, and alternatively, a new trial pursuant to

Rule 33 is denied.

IT IS SO ORDERED.

ENTER:

_____

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: November 6, 2015